[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

No. 96-4931
_____

D.C. Docket No. 95-CV-2650-CV-FAM

PATRICIA GONZALES LOPEZ,

Plaintiff-Appellant,

versus

FIRST UNION NATIONAL BANK
OF FLORIDA,

Defendant-Appellee.

_____

No. 97-4238
_____
D.C. Docket No. 96-7115-CV-JAG

JOSE DANIEL RUIZ CORONADO,

Plaintiff-Appellant,

versus

BANKATLANTIC BANCORP, INC.,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

**(November 21, 1997)**

Before CARNES, Circuit Judge, and KRAVITCH and REAVLEY[*], Senior
Circuit Judges.

_____

[*]Honorable Thomas M. Reavley, Senior U.S. Circuit Judge for
the Fifth Circuit, sitting by designation.

CARNES, Circuit Judge:

These cases, consolidated for purposes of this appeal, arise out of plaintiffs' claims that their banks improperly disclosed information relating to their checking accounts to federal authorities. The complaint in each case was dismissed on the ground that the safe harbor provisions of the Annunzio-Wylie Anti-Money Laundering Act, 31 U.S.C. § 5318(g), immunized the banks from liability. For the reasons set forth below, we reverse the judgments dismissing the complaints on that ground.

## I.  THE LOPEZ CASE

We will discuss the two cases separately, beginning with the one Patricia Lopez brought against First Union National Bank ("First Union").

### A.  FACTS AND PROCEDURAL HISTORY

Because this case is before us on appeal from a Federal Rules of Civil Procedure 12(b)(6) dismissal for failure to state a claim, we limit ourselves to the allegations of the complaint, which we are required to accept as true. Those allegations may turn out to be inaccurate, or there may be additional facts which dictate a different result, but for now the factual boundary of this case is marked by the metes and bounds of the complaint.

The FedWire Fund Transfer System is an electronic funds transfer system which permits large dollar fund transfers by computer-to-computer communications between banks. First Union is a bank within the FedWire Fund Transfer System and uses "electronic storage" to maintain the contents of an electronic funds transfer.

2

On September 2, 1993, and November 30, 1993, First Union received an electronic wire transfer of funds for credit to Lopez's account. On both occasions, First Union provided United States law enforcement authorities with access to the contents of those electronic transfers. First Union made these disclosures based solely on the "verbal instructions" of federal law enforcement authorities.

On February 3, 1994, a United States Magistrate Judge issued a seizure warrant directing First Union to freeze Lopez's account and conduct an inventory of it. Pursuant to the seizure warrant, First Union again provided United States law enforcement authorities access to the contents of the electronic fund transfers sent to Lopez that were being held in electronic storage. On June 6, 1995, First Union surrendered the $270,887.20 balance of Lopez's First Union account to the United States. The United States subsequently filed a civil forfeiture case against Lopez, which was resolved by a stipulation that $108,359 of Lopez's account was forfeited to the United States while $162,532.20 was returned to her.

Following the resolution of the civil forfeiture case, Lopez filed suit against First Union asserting claims under the Electronics Communications Act 18 U.S.C. §§ 2501 et seq. (Counts I and II), the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 et seq., (Count III), and Florida law. (Count IV).

First Union moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be

3

granted. The district court granted the motion and dismissed Lopez's complaint with prejudice. The district court's decision to dismiss the complaint was based exclusively on its conclusion that the Annunzio-Wylie Anti Money Laundering Act, 31 U.S.C. § 5318(g)(3), immunized First Union from liability. This appeal followed.

## B. STANDARD OF REVIEW

We review de novo the dismissal of a complaint for failure to state a claim for relief, accepting all allegations in the complaint as true and construing those allegations in the light most favorable to the plaintiff. See Harper v. Thomas, 988 F.2d 101, 103 (11th Cir. 1993). A complaint may not be so dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Pataula Elec. Membership Corp. v. Whitworth, 951 F.2d 1238, 1240 (11th Cir.) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957)).

## C. ANALYSIS

As a preliminary matter, we first address First Union's arguments that Lopez's complaint fails to state a claim under either the Electronic Communication Privacy Act, 18 U.S.C. §§ 2501 et seq., ("the ECPA") or the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 et seq., ("the RFPA").[2] We will then address the

_____

[2]Because the district court dismissed Lopez's complaint on the ground that the Annunzio-Wylie Anti-Money Laundering Act immunized First Union from liability, it did not address these issues. However, the parties have briefed them, and in view of our disagreement with the district court's dismissal of the complaint

4

additional issue of whether the Annunzio-Wylie Anti-Money Laundering Act, 31 U.S.C. § 5318(g)(3) immunizes First Union from liability.

## 1. Lopez's Claims Under the ECPA

In 1986, Congress clarified the existence of privacy rights in electronic communications by enacting the ECPA, which provides "protect[ion] against the unauthorized interception of electronic communications." Sen. Rep. No. 99-541 at 3555. Among other things, the ECPA defines the conditions in which an electronic communications service may divulge the contents of electronic communications, see, e.g., 18 U.S.C. § 2702; 18 U.S.C. 2711, defines the conditions in which the government is entitled to access an individual's electronic communications, see 18 U.S.C. 2703, and provides a civil cause of action for anyone injured by a violation of the act's substantive provisions, see 18 U.S.C. 2707.

In counts I and II of her complaint, Lopez alleges that First Union violated her rights under the ECPA. In count I, she specifically alleges that First Union violated 18 U.S.C. § 2702(a)(1), which provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." The complaint alleges that First Union provided an electronic communication service and that First Union provided the United States access to

on Annunzio-Wylie grounds, judicial economy counsels in favor of our addressing them.

5

"the contents of information in electronic storage, including the contents of electronic communications pertaining to . . . Lopez."

First Union contends that count I fails to state a viable claim under 18 U.S.C. § 2702(a)(1), because it is not an electronic communication service. We reject that contention which amounts to nothing more than a denial of the allegations in Lopez's complaint. Accepting all allegations in the complaint as true as we are required to do at this stage, we conclude that Count I states a violation of 18 U.S.C. § 2702(a)(1).[3]

In count II, Lopez alleges that First Union infringed her rights under the ECPA by violating 18 U.S.C. § 2703 and 18 U.S.C. § 2711(3)(a). Section 2703 defines the conditions in which an electronic communication service may disclose electronic communications to the government. If the electronic communication service has held the contents of an electronic communication in electronic storage for one hundred eighty days or less, it may disclose that electronic communication to the government only pursuant to a federal or state warrant. See 18 U.S.C. 2703(a). In Count II, Lopez alleges that, on the same day funds were electronically transferred to her account, First Union disclosed contents of those electronic funds transfers in electronic storage pursuant to "verbal instructions" instead of a warrant. She also

---

[3]Nor does the fact that Congress amended the ECPA in 1996 to specifically exclude electronic funds transfers from the definition of an "electronic communication," see 18 U.S.C. § 2510(15) (1996), prevent Count I from stating a claim under § 2702(1)(a). That amendment did not take effect until 1996, well after the events giving rise to this case.

alleges that the disclosures were made on the same day that funds were electronically transferred to her account, which means the communication disclosed had been held in electronic storage for less than one hundred eighty days. Those allegations are sufficient to state a prima facie claim under 18 U.S.C. § 2703.

However, the allegations of Count II of the complaint are not sufficient to state a claim under 18 U.S.C. § 2711(3)(a). That section provides that "an electronic communication service . . . shall not intentionally divulge the contents of any communication . . . while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication." 18 U.S.C. § 2711(3)(a) (emphasis added). That proscription is not violated unless the communication is divulged "while in transmission." Neither Count II nor any other part of the complaint alleges that First Union disclosed Lopez's electronic communications "while in transmission." Instead, Count II alleges that First Union disclosed the contents of electronic communications held in electronic storage.

Alleging that First Union disclosed a communication held in "electronic storage," which violates § 2702(a)(1), is not equivalent to alleging that First Union disclosed a communication in "transmission," which would violate § 2711(3)(a). Because the complaint does not allege that First Union disclosed communications while in transmission, it fails to state a claim under § 2711(3)(a).

7

## 2. Lopez's Claim Under the RFPA

In <u>United States v. Miller</u>, 425 U.S. 435, 443, 96 S.Ct. 1619, 1623 (1976), the Supreme Court held that individuals have no Fourth Amendment expectation of privacy in their financial records while those records are in the hands of third parties. That decision prompted Congress to enact the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 <u>et</u> <u>seq</u>., ("the RFPA"), which provides individuals with some privacy rights in financial records that are in the hands of third parties. Among other things, the RFPA defines the conditions in which financial institutions may disclose an individual's financial records, <u>see</u> 12 U.S.C. § 3403, defines the conditions in which government officials may access an individual's financial records, <u>see</u> 12 U.S.C. § 3402, and provides a civil cause of action for anyone injured by a violation of the act's substantive provisions, <u>see</u> 12 U.S.C. § 3417.

In count III of her complaint, Lopez alleges First Union violated her rights under the RFPA by disclosing her financial records under conditions not authorized by the RFPA. First Union does not argue that Lopez has failed to allege a prima facie violation of the RFPA. Instead, it contends that count III should be dismissed because the alleged disclosures are protected by 12 U.S.C. § 3403(c), another section of the RFPA. Under § 3403(c), a financial institution possessing information relevant to a possible violation of law involving one of its accounts is permitted to make a disclosure of that information to law enforcement. However, the disclosure permitted is limited to the name of the account holder

8

and "the nature of any suspected illegal activity." 12 U.S.C. § 3403(c). Because the complaint alleges that First Union went beyond that and disclosed actual financial records pertaining to Lopez's account (i.e., the electronic funds transfers communications, the contents of which were held in electronic storage), First Union's alleged disclosures are not protected by 12 U.S.C. § 3403(c). Accordingly, count III of Lopez's complaint states a claim under the RFPA.

      3. <u>The Annunzio-Wylie Anti-Money Laundering Act</u>

The Annunzio-Wylie Anti-Money Laundering Act of 1992, 31 U.S.C. § 5318(g), provides in relevant part:

g) Reporting of suspicious transactions.--

    (1) In general.--The [Treasury] Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.

    (2) Notification prohibited.--A financial institution, and a director, officer, employee, or agent of any financial institution, who voluntarily reports a suspicious transaction, or that reports a suspicious transaction pursuant to this section or any other authority, may not notify any person involved in the transaction that the transaction has been reported.

    (3) Liability for disclosures.--Any financial institution that makes [i.] a disclosure of any possible violation of law or regulation or [ii.] a disclosure pursuant to this subsection or [iii.] any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.

9

The three safe harbors provided by § 5318(g)(3) supply an affirmative defense to claims against a financial institution for disclosing an individual's financial records or account-related activity. Financial institutions are granted immunity from liability for three different types of disclosures:

> (i.) A disclosure of any possible violation of law or regulation,
> (ii.) A disclosure pursuant to § 5318(g) itself, or
> (iii.) A disclosure pursuant to any other authority.

See 31 U.S.C. § 5318(g)(3).

The district court dismissed Lopez's complaint after concluding that the safe harbor provisions of § 5318(g)(3) protected First Union's disclosures of her account activity. Lopez contends that the district court's holding is erroneous for two reasons. First, she contends that § 5318(g)(3)'s safe harbor provisions apply only to disclosures of currency transactions. If that is true, First Union's disclosure of electronic transfers and the contents of transfers held in electronic storage are not protected by any of the safe harbor provisions of § 5318(g)(3). Second, Lopez contends that even if the Act does cover more than currency transactions, First Union's disclosures do not fall within one of the three categories of disclosures for which § 5318(g)(3) grants immunity. Addressing Lopez's contentions in turn, we disagree with the first one but agree with the second.

a. *Does § 5318(g)(3) Apply to Disclosures of Electronic Transfers and Contents Held in Electronic Storage?*

Lopez's contention that § 5318(g)(3) protects disclosures of currency transactions only is at odds with the text and purpose of

10

the Annunzio-Wylie Act. The text of § 5318(g)(3) neither explicitly nor implicitly suggests that Congress intended to limit the safe harbor to disclosures of currency or to any specific kind of transaction. To the contrary, the text of that subdivision indicates Congress deliberately did not limit the safe harbor to disclosure of any specific type of transaction. For example, § 5318(g)(3) provides that a financial institution is entitled to immunity for a disclosure of "any possible violation of law." 31 U.S.C. § 5318(g)(3) (emphasis added). As we have recently had occasion to explain, when used in a statute, "the adjective 'any' is not ambiguous; it has a well-established meaning." Merritt v. Dillard Paper Company, 120 F.3d 1181, 1186 (11th Cir. 1997). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." Id., quoting United States v. Gonzales, 117 S.Ct. 1032, 1035 (1997) (citation and some quotation marks omitted). Thus § 5318(g)(3) protects disclosure of a violation of law regardless of whether it involves a cash transaction, electronic transfers, or any other type of transaction. Section 5318(g)(3)'s scope is not limited merely to disclosures of currency transactions.

Moreover, we agree with the district court that the purpose underlying the Act is inconsistent with Lopez's proposed construction. The district court reasoned as follows:

> [A]ccording to the comments of Congressman Neal regarding the enactment of 31 U.S.C. § 5318(g), banks have long been encouraged to report suspicious transactions to the appropriate authorities. See Cong.Rec. E57-02 (1993). Therefore, to ensure compliance from the banks, the safe harbor provision was added in order to protect a bank

11

> when it reports a suspicious transaction. <u>Id</u>. "The goal
> of this new law is to have banks work with international
> efforts to stop the global movement of drug money. Money
> laundering is an international problem. Money knows no
> borders and flows freely from one country to another.
> The United States has long recognized that, and has
> worked hard to ensure cooperation from foreign
> governments and financial institutions to assure that
> money launderers have no place to hide." <u>Id</u>.
>
> The Court finds that if Congress intended to limit this
> statute solely to "currency transactions" as asserted by
> Plaintiff, it would severely restrict the ability of a
> bank to report suspicious transactions without the fear
> of liability. As Plaintiff notes in her response to
> Defendant's motion, "[i]n 1994, some 72 million fund
> transfers with a total value of $211 trillion were moved
> over Fedwire." <u>Plaintiff's Response Memorandum</u>, p. 11 n.
> 8, citing <u>Fedpoint 43</u>. Thus, the effectiveness of the
> anti-money laundering act would be substantially limited
> if it applied only to cash transactions, since electronic
> fund transfers, the contents of which are held in
> electronic storage, are the means by which large dollar
> funds are transferred between the Federal Reserve and the
> service providers (i.e., originating banks, intermediary
> banks, and beneficiary banks)

<u>Lopez v. First Union National Bank</u>, 931 F.Supp. 860, 864 (S.D. Fla. 1996).

Accordingly, we hold that electronic fund transfers and information held in electronic storage are not outside the scope of the Annunzio-Wylie Anti-Money Laundering Act's safe harbor provisions, 31 U.S.C. § 5318(g)(3).

b. *Are First Union's Disclosures Protected By § 5318(g)(3)'s Safe Harbor Provisions?*

The Annunzio-Wylie Act does not provide a financial institution blanket immunity for any disclosure of an individual's financial records. Instead, a financial institution is entitled to immunity only if its disclosure falls within one of the three safe harbors set forth in § 5318(g)(3). Lopez's complaint alleges

12

that First Union disclosed Lopez's financial records twice in response to nothing more than "verbal instructions" of government officials and once pursuant to a seizure warrant. Under the facts alleged in Lopez's complaint, First Union's two disclosures in response to "verbal instructions" of government officials do not fit within any of § 5318(g)(3)'s three safe harbors. However, its disclosure pursuant to the seizure warrant is protected by § 5318(g)(3)'s third safe harbor.

The first safe harbor provision protects a financial institution's "disclosure of a possible violation of law or regulation." 31 U.S.C. § 5318(g)(3). As the use of the adjective "possible" indicates, a financial institution's disclosure is protected even if it ultimately turns out there was no violation of law. In order to be immune from liability, it is sufficient that a financial institution have a good faith suspicion that a law or regulation may have been violated, even if it turns out in hindsight that none was. By extending immunity to a financial institution's disclosure of a suspected violation of law or regulation, the first safe harbor encourages financial institutions to voluntarily play a role in combating money laundering and other crimes.

The problem for First Union at this stage of the litigation is that it is stuck with the allegations of the complaint. Those allegations do not show that First Union had a good faith suspicion that a law or regulation may have been violated. None of the allegations indicate that the transactions associated with Lopez's

13

accounts were suspicious enough to suggest a possible violation of law. First Union contends, however, that the first safe harbor should protect disclosures made in response to "verbal instructions" of government officials. It argues that law enforcement's demand for financial records should, by itself, be sufficient to give a financial institution a good faith basis to suspect a possible violation of law or regulation. The hidden premise of that argument is that Congress intended the first safe harbor to protect disclosures made pursuant to government officials' unexplained request or unvarnished instructions for financial records. That premise is flawed.

As we will discuss below, the second and third safe harbors protect from liability in situations where the government has and exercises the legal authority to demand disclosure of financial records. If we accepted First Union's premise that Congress intended the first safe harbor to protect disclosures made pursuant to any and all government demands, it would render the other two safe harbor provisions superfluous. Following the basic principle of statutory construction "that a statute should not be construed in such a way as to render certain provisions superfluous or insignificant," Woodfork v. Marine Cooks & Stewards Union, 642 F.2d 966, 970 (5th Cir. 1981), we reject First Union's contention that the first safe harbor protects disclosures made in response to nothing more than "verbal instructions" of government officials.

Having concluded that the first safe harbor provision does not protect First Union from liability for the alleged disclosures, we

14

turn now to the second. The second safe harbor provision protects a financial institution's "disclosure pursuant to this subsection." 31 U.S.C. § 5318(g)(3). Disclosures "pursuant to this subsection" are disclosures required by the Office of the Treasury Secretary under the rule-making authority vested in the Treasury Secretary by 31 U.S.C. § 5318(g)(1), which provides:

> The [Treasury] Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.

In February 1996, the Treasury Secretary issued regulations under this sub-section. See 12 C.F.R. § 21.11 (1996); see also 61 Fed. Reg. 4326 (1996); 61 Fed. Reg. 4338 (1996); 61 Fed. Reg. 6100 (1996); 61 Fed. Reg. 6095 (1996). The second safe harbor protects any disclosures required by those regulations.

However, the complaint alleges that First Union's disclosures occurred in 1993 and 1994. Because the Treasury Secretary's regulations under § 5318(g)(1) were not in effect at the time those alleged disclosures were made, the second safe harbor provision cannot immunize First Union's disclosures.

The third safe harbor provision protects a financial institution's disclosure pursuant to "any other authority." 31 U.S.C. § 5318(g)(3). Because the second safe harbor protects disclosures pursuant to the legal authority of the Treasury Secretary's regulations, "other authority" means authority other than the Treasury Secretary's regulations. The "other authority" must be legal authority, because authority means "[r]ight to

15

exercise powers," Black's Law Dictionary 133 (6th Ed. 1991), and in our system based on rule of law, the right to exercise power is derived from law, e.g., statutes, regulations, court orders, etc. Hence, for a financial institution's disclosure to fall within the confines of the third safe harbor, the financial institution must be able to point to a statute, regulation, court order, or other source of law that specifically or impliedly authorized the disclosure. If it cannot do so, the disclosure is not entitled to the protection of the safe harbor.

The complaint alleges that First Union disclosed Lopez's financial records twice in response to "verbal instructions" of government officials and once in response to a seizure warrant. Clearly, a disclosure in response to a seizure warrant is protected by the third safe harbor. The seizure warrant represented a judicial determination that the government had a legal right to obtain Lopez's financial records. First Union was neither required nor permitted to sit in review of the court's legal determination. It is immune from any liability for any disclosures made pursuant to the seizure warrant, which was issued on February 3, 1994.

However, First Union's earlier disclosures are a different matter, because disclosures in response to nothing more than the "verbal instructions" of government officials are not protected by the third safe harbor. They are not, because under existing law and regulations, a government official's verbal instructions do not constitute legal authority. First Union fails to identify any statute or regulation which gives a government official's verbal

16

request to access an individual's financial records the force of law. Nor does First Union point to a statute or regulation authorizing a financial institution to release an individual's financial records in response to mere verbal instructions of government officials. We can find nothing in the Annunzio-Wylie Act which entitles government officials to gain access to financial records simply by verbal request. Therefore, because the facts alleged in the complaint do not show First Union acted pursuant to any legal authority when it released Lopez's financial records, the third safe harbor provision does not protect First Union's disclosures.

We also reject First Union's argument that its disclosures of Lopez's account activity were made pursuant to "other authority" because there were regulations, see e.g. 12 C.F.R. § 21.11 (1989), in effect at the time disclosures were made that required reporting suspicious transactions. That argument simply overlooks the fact that on a motion to dismiss, we are bound to consider only the facts alleged in the complaint. Lopez's complaint does not allege that Lopez's transactions were suspicious or were viewed as suspicious by First Union.

In sum, we hold that First Union's disclosures of Lopez's financial records in response to nothing more than the "verbal instructions" of government officials are not protected by § 5318(g)(3)'s safe harbors, except that its disclosure pursuant to the seizure warrant is protected by the third safe harbor. Because

17

the district court erred in dismissing Lopez's complaint, we reverse its judgment.

## II.    THE CORONADO CASE

We turn now to the case brought by Jose Daniel Ruiz Coronado and the approximately eleven hundred account holders ("the Account Holders") he wants to represent in this attempted class action lawsuit against BankAtlantic Bancorp Inc. ("BankAtlantic").[4]

## A.    FACTS AND PROCEDURAL HISTORY

This case, like the Lopez case, is here on appeal from a Rule 12(b)(6) dismissal.  As we stressed in our discussion of the Lopez case, at this stage the facts are limited to the allegations in Coronado's complaint, which we must accept as true.

Again, the FedWire Fund Transfer System is an electronic funds transfer system which permits large dollar fund transfers by computer-to-computer communications between banks.  BankAtlantic is a bank within the FedWire Fund Transfer System and uses "electronic storage" to maintain the contents of the electronic funds transfer.

In June 1995, BankAtlantic notified federal agents concerning the "unusual amounts" and "unusual movements" of money at the bank. Thereafter, BankAtlantic provided federal agents access to the "detailed contents of financial information in electronic storage, including the contents of electronic communications, pertaining to the Account Holders."  Federal agents subsequently "seized the Account Holders' accounts upon allegations of money laundering."

---

[4]Coronado's complaint was dismissed before a hearing on class status could be held.

18

Eventually, the federal agents released 400 to 600 of the Account Holders' accounts because they had "no connection with money laundering."[5]

Subsequently, Coronado, on behalf of himself and the Account Holders, filed a class action suit against BankAtlantic, asserting claims under the Electronics Communications Act 18 U.S.C. §§ 2501 et seq. (Counts I-IV), the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 et seq., (Count V), and Florida law. (Count VI). BankAtlantic moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). The district court granted the motion and dismissed Coronado's complaint with prejudice. The decision to dismiss the complaint was based exclusively on its conclusion that the Annunzio-Wylie Anti Money Laundering Act, 31 U.S.C. § 5318(g), immunized BankAtlantic from liability. This appeal followed.

### B. ANALYSIS

The sole issue we must decide is whether BankAtlantic's disclosure of information pertaining to the Account Holders' accounts is protected by the safe harbor provisions of § 5318(g)(3).[6]

BankAtlantic argues that its disclosure falls within § 5318(g)(3)'s first safe harbor -- a "disclosure of any possible

---

[5]The complaint does not specify whether Coronado's account was among those released.

[6]BankAtlantic did not contend, either before the district court or on appeal, that the complaint should be dismissed because it failed to state a claim under the ECPA or the RFPA.

19

violation of law."  It asserts that the facts alleged in Coronado's complaint indicate that BankAtlantic suspected a violation of law based on its detections of "unusual amounts" and "unusual movements" of money in the bank and that it disclosed the information from the Account Holders' accounts as a result of those detections.  BankAtlantic maintains that under those facts, its disclosures are protected by the first safe harbor.

That argument sounds good, but we are required to construe the complaint in the light most favorable to Coronado and not dismiss it unless there is no set of facts he could prove that would entitle him to relief, i.e., which would deny BankAtlantic the immunity it seeks from the first safe harbor.  The complaint alleges that BankAtlantic disclosed the protected account information of 1,100 accounts after it detected "unusual amounts of money _in_ the bank" and "unusual movements of money _at_ the bank" (emphasis added).  Construed in the light most favorable to Coronado, the allegations that BankAtlantic detected suspicious activity "in" and "at" the bank could mean that BankAtlantic detected suspicious activity in only one account or a few accounts.  But if BankAtlantic detected suspicious activity in only one account, it may well not have had a good faith basis to suspect a violation of law in the remaining 1,099 accounts, and the same is true if the suspicious activity was in only a few accounts.

Of course, we could continue this exercise and come up with any number of hypotheticals in which the complaint's allegations do not show that BankAtlantic's disclosures of all the accounts are

20

protected by the first safe harbor. But the more important and generalizable point is this: the allegations in the complaint, construed in the light most favorable to Coronado, do not show that BankAtlantic determined in good faith that there was any nexus between the suspicious activity it detected and the information it disclosed from more than a thousand accounts. In order for § 5318(g)(3)'s first safe harbor to protect a financial institution's disclosures, there must be some good faith basis for believing there is a nexus between the suspicion of illegal activity and the account or accounts from which information is disclosed. If it were otherwise, a bank would have free license to disclose information from any and every account in the entire bank once it suspected illegal activity in any account at the bank. We do not think Congress intended such a drastic result which would needlessly strip away any right or expectation of privacy in financial records and effectively undo virtually all of what Congress did when it enacted the Right to Financial Privacy Act and the Electronic Communications Privacy Act. Therefore, BankAtlantic's disclosures, as they are described in the complaint read in the light most favorable to Coronado, are not protected by § 5318(g)(3)'s first safe harbor provision.[7]

---

[7]We note that if the allegations in the complaint specifically identified the accounts in which BankAtlantic detected suspicious activity and any additional accounts with a nexus to them, BankAtlantic would be entitled to partial Rule 12(b)(6) relief because a disclosure of those accounts would be protected by the first safe harbor. However, the complaint does not so identify the accounts, therefore this issue will have to be resolved at a later stage in the proceedings.

We caution, however, that our holding should not be read to mean that the only accounts that can be disclosed are those actually reflecting the unusual movements of money. There could be instances in which unusual movements or other suspicious activity in an account provides a reasonable basis for disclosing other accounts. We will not attempt to list circumstances in which there could be a good faith basis for believing that a nexus existed between the suspicious activity in one account and other accounts. It is enough for present purposes that no such basis is apparent in the complaint.

BankAtlantic also argues that its disclosure falls within § 5318(g)(3)'s third safe harbor -- a disclosure pursuant to "any other authority." Specifically, BankAtlantic claims its disclosures were authorized by 12 C.F.R. § 563.180 (1994), which requires banks to "promptly notify appropriate law enforcement authorities" after discovering "suspected criminal acts." Again, however, there must be some good faith basis for believing there is a nexus between the suspicion of illegal activity and the account or accounts from which information is disclosed. Thus, BankAtlantic's disclosures, as they are described in the complaint read in the light most favorable to Coronado, are not clearly within § 5318(g)(3)'s third safe harbor provision.

Because we conclude that BankAtlantic's disclosures are not protected by § 5318(g)(3), the district court's dismissal of Coronado's complaint is due to be reversed.

22

### III. CONCLUSION

The district court's dismissal of Lopez's complaint is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

The district court's dismissal of Coronado's complaint is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.