PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-12108

_____

D.C. Docket No. 96-07115-CV-JAG

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 18, 2000
THOMAS K. KAHN
CLERK

JOSE DANIEL RUIZ CORONADO,

Plaintiff-Appellant,

versus

BANK ATLANTIC BANCORP, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida.

_____

**(August 18, 2000)**

Before TJOFLAT, MARCUS and CUDAHY[*], Circuit Judges.

CUDAHY, Circuit Judge:

BankAtlantic Bancorp, Inc. (BankAtlantic) responded to grand jury subpoenas by producing the bank records of nearly 1100 international customers. Coronado, one

_____

[*] Honorable Richard D. Cudahy, U.S. Circuit Judge for the Seventh Circuit sitting by designation.

of these customers purporting to represent a class including the others, filed this lawsuit against BankAtlantic for unlawful disclosure of financial information, claiming that BankAtlantic's disclosure violated federal and state law. BankAtlantic claimed immunity under the Annunzio-Wylie Anti-Money Laundering Act's (Annunzio-Wylie Act or Act) safe harbor provision, 31 U.S.C. § 5318(g)(3), because their disclosure was made pursuant to the grand jury subpoenas. The district court initially granted BankAtlantic's motion to dismiss, but this court reversed and remanded. *See Lopez v. First Union Nat'l Bank of Florida*, 129 F.3d 1186, 1196 (11th Cir. 1997). On remand, the case proceeded to discovery, and Coronado filed several motions to compel disclosure of copies of the grand jury materials as well as information on BankAtlantic's internal operations. The district court denied these motions. BankAtlantic then moved for summary judgment, and the district court granted that motion. Coronado appeals.

I.     Facts and Disposition Below

A.     General Background

In February of 1995, BankAtlantic acquired MegaBank, a Dade County commercial bank, in order to create an international division. MegaBank's international division was headed by Piedad Ortiz, and after the acquisition, she

2

became Vice President of BankAtlantic's international division. Ortiz had overseen approximately 1100 accounts at MegaBank, and she continued this supervision at BankAtlantic. Shortly after acquiring MegaBank, BankAtlantic conducted an internal audit of its new international division, and this audit revealed suspicious practices. A private pouch service made regular deliveries addressed to "BankAtlantic, International Division, Attention Ms. Piedad Ortiz." These pouches, which were uninsured, contained large amounts of checks, money orders and negotiable instruments along with deposit and transfer instructions. The pouches originated from a private courier service—discretely located in the back of another business—in Bogota, Columbia, and the checks and other instruments transported in the pouches were from various locations in the United States, including New York and New Jersey. BankAtlantic discovered that Ortiz and her assistant, Lucia Ramirez (who had also joined BankAtlantic as part of the MegaBank acquisition), were responsible for initiating and maintaining this pouch service.

The BankAtlantic audit also revealed that Ortiz and her assistant were approving new accounts that were missing required customer identification documentation and allowing personal accounts to be used as unregistered money exchange facilities (in probable violation of Florida law). Further, BankAtlantic

discovered, among other irregularities, that letters of authorization were missing for numerous wire transfers and that no currency transaction reports were filed when bearer instruments in excess of $10,000 arrived in the pouches from Bogota. There were millions of dollars flowing into and out of these Columbia-based accounts each month.

BankAtlantic became suspicious that its new international division, as headed by Ortiz, was facilitating money laundering and bank fraud. BankAtlantic took these suspicions to federal law enforcement officials in June of 1995. At this point, the bank provided general information regarding its suspicions along with customer names and account numbers for only five accounts obviously connected with this questionable activity. BankAtlantic did not disclose the contents of any incoming or outgoing wire transfers at this time.

The federal government investigated this suspected money laundering and bank fraud, and sometime in the spring of 1996, three grand juries were impaneled. These grand juries—sitting in the Southern District of Florida, the Eastern District of New York and the District of New Jersey—investigated individuals and organizations in Florida, New York and New Jersey for the suspected laundering of Columbian drug money. In the late spring, the grand juries issued and served subpoenas on BankAtlantic demanding that it produce copies of account

4

documents, records and information regarding the 1100 accounts under the oversight of Ms. Ortiz in the international division.

The federal investigation was centered on these 1100 accounts that Ortiz had supervised at MegaBank and later at BankAtlantic, and on June 5, 1996, the United States Department of Justice, in conjunction with Columbian law enforcement agencies, announced the arrest of several individuals: Ortiz and Ramirez[1] were arrested upon suspicion that they were committing bank fraud to facilitate the illegal movement of funds by individuals in Columbia. Also on June 5, Judge Davis of the Southern District of Florida issued a ten-day ex parte temporary restraining order freezing the 1100 accounts in BankAtlantic's international division. On June 11, 1996, Judge Davis released the funds in some accounts, and then, on June 23, the district court issued a seizure warrant to freeze the remaining accounts until further court order. A supplemental order directed the Drug Enforcement Agency (DEA) to physically seize all of the frozen funds (subject to certain exceptions not relevant here). Accordingly, BankAtlantic turned the funds over to the DEA on August 1, and on August 8, forfeiture proceedings were commenced against many of the accounts. About six months after the initial

---

[1] On June 14, 1996, a federal grand jury indicted both Ortiz and Ramirez for making false entries in the books and records of BankAtlantic to keep the bank unaware of the currency transfer operation from Columbia.

seizure, the government agreed to release between 400 and 600 of the accounts—there is no evidence in the record suggesting why—and the funds were returned to these account holders with full interest in December of 1996.

B.     Coronado's Account and Lawsuit

Coronado opened his account with BankAtlantic on May 13, 1996—almost a year after BankAtlantic first reported suspicious activity to the federal government and, as it turned out, about three weeks before Ortiz's arrest. Ortiz had opened the account for Coronado using instruments drawn on United States's banks that had been shipped from Bogota, Columbia, to Miami via the private courier service. Coronado's initial deposit consisted of four checks in odd amounts that totaled exactly $5000 in value, and subsequent deposits were comprised of checks, travelers' checks and money orders drawn on banks in New York and New Jersey. Once the amount Coronado had on deposit grew to a little less then $46,000, $45,500 was wire transferred to a Swiss bank account. The day after the transfer, new deposits began. BankAtlantic had not mentioned Coronado in its initial disclosure to federal authorities in 1995 (recall, he did not open his account until 1996), but Coronado's account information and the records of the wire transfer to Switzerland were turned over to the grand jury pursuant to the 1996 subpoenas. On June 5, 1996, Coronado's account was frozen along with the

6

other 1100 that Ortiz had supervised, but his account was not among those released on June 11. Instead, his funds were seized pursuant to the district court orders, and forfeiture proceedings were commenced against Coronado's account on August 8. His account was eventually released, along with the 400 to 600 others, pursuant to the agreement with the government, and his funds were returned (with interest) before the end of 1996.

Months earlier, on September 30, 1996, Coronado had filed this lawsuit against BankAtlantic, purportedly representing a class consisting of himself and the other 1100 holders of accounts in BankAtlantic's international division. In his complaint, Coronado alleged that BankAtlantic violated the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2510 *et seq*., the Right to Financial Privacy Act (RFPA), 12 U.S.C. § 3401 *et seq*., and Florida law by disclosing account information and records to the grand juries. Before class certification, BankAtlantic moved to dismiss Coronado's complaint under Federal Rule of Civil Procedure 12(b)(6), and the district court granted that motion, dismissing Coronado's complaint with prejudice exclusively on the ground that BankAtlantic was immune from suit under the Annunzio-Wylie Act's safe harbor provision, 31 U.S.C. § 5318(g)(3). On appeal, this court reversed and remanded because the allegations in Coronado's complaint, taken in the light most favorable

7

to Coronado, did not establish grounds for BankAtlantic's immunity. *See Lopez*, 129 F.3d at 1194-96. On remand, the case proceeded through a few months of discovery, with Coronado making motions to compel BankAtlantic's production of copies of the grand jury subpoenas and documents turned over to the grand juries as well as to compel production of other BankAtlantic information. The district court denied all these motions, and in June of 1998, BankAtlantic moved for summary judgment. The district court granted BankAtlantic's motion, again on the ground that the bank was shielded by the safe harbor provisions of the Annunzio-Wylie Act. Coronado again appeals.

II. Discussion

In his brief on appeal, Coronado identifies three issues we must decide: (1) whether the Annunzio-Wylie Act provides BankAtlantic with immunity from his claims under federal and state law; (2) whether Coronado was entitled to partial summary judgment that BankAtlantic had violated the RFPA and the ECPA; and (3) whether the district court erred in denying Coronado's motions to compel discovery. We review the first two issues de novo, *see Ross v. Clayton County, Ga.*, 173 F.3d 1305, 1307 (11th Cir. 1999), and review the discovery issue for abuse of discretion, *see Leigh v. Warner Brothers, Inc.*, No. 99-10087, 2000WL

8

679162, at *7 (11th Cir. May 25, 2000).

A.    Immunity Under the Annunzio-Wylie Act

In 1992, Congress enacted the Annunzio-Wylie Anti-Money Laundering Act in order to facilitate cooperation between domestic financial institutions and the United States government to stop the global movement of drug money. Large criminal enterprises depend on their ability to conceal the proceeds of their criminal endeavors, and the Annunzio-Wylie Act seeks to make concealment much more difficult by encouraging financial institutions to disclose suspicious activity and cooperate with law enforcement efforts. But, because disclosure of financial information—either spontaneously or after a request from the government—could possibly lead to litigation with disgruntled customers like Coronado, the Annunzio-Wylie Act granted immunity to banks making disclosures. The safe-harbor provision, to this end, reads in its entirety as follows:

> Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.

31 U.S.C. § 5318(g)(3). The plain language of this section supplies "an affirmative defense to claims against a financial institution for disclosing an individual's

9

financial records or account-related activity." *Lopez*, 129 F.3d at 1191. Few courts have had the opportunity to examine this section in detail, but we recently explained in *Lopez* that § 5318(g)(3) grants to financial institutions "immunity from liability for three different types of disclosures: (i.) A disclosure of any possible violation of law or regulation, (ii.) A disclosure pursuant to § 5318(g) itself, or (iii.) A disclosure pursuant to any other authority." *Id..* These safe harbors are not limited to currency transactions, and any one of them provides a disclosing bank complete immunity. *See id.* at 1192.

BankAtlantic claims, and Coronado does not dispute, that the grand jury subpoenas it received were facially valid and properly served. BankAtlantic argues, quite simply, that because it only disclosed information pursuant to these subpoenas, it disclosed information in accordance with "other authority" and has immunity under the Annunzio-Wylie Act's safe harbor (iii). In *Lopez*, we explained § 5318(g)(3)'s third safe harbor and the meaning of "any other authority" as follows:

> The "other authority" must be legal authority, because authority means "[r]ight to exercise powers," Black's Law Dictionary 133 (6th ed. 1991), and in our system based on rule of law, the right to exercise power is derived from law, e.g. statutes, regulations, court orders, etc. Hence, for a financial institution's disclosure to fall within the confines of the third safe harbor, the financial institution must be able to point to a statute, regulation, court order, or other source of law that specifically or impliedly authorized the disclosure. If it cannot do so,

10

the disclosure is not entitled to the protection of the [third] safe harbor.

*Lopez*, 129 F.3d at 1193-94. In *Lopez*, by way of example, we explained that "[c]learly a disclosure in response to a seizure warrant is protected by the third safe harbor." *Id*. at 1194. However, we also explained that a government agent's "verbal request" for information is not "other authority" because there is no "statute or regulation which gives a government official's verbal request to access an individual's financial records the force of law." *Id*. *Lopez* did not explicitly address grand jury subpoenas, but we believe that these are properly considered "other authority" for the purposes of § 5318(g)(3).

A federal grand jury has extremely broad investigatory powers and, unlike a federal agent making a verbal request, "may *compel* the production of evidence or the testimony of witnesses as it considers appropriate." *United States v. Calandra*, 414 U.S. 338, 343 (1974). A grand jury has the power to compel the production of evidence because "a federal grand jury subpoena is issued under the authority of a court." *Doe v. DiGenova*, 779 F.2d 74, 80 (D.C. Cir. 1985). More specifically: under Federal Rule of Criminal Procedure 17(a), the clerk of a district court is authorized to issue blank subpoenas (marked with the seal of the court) to a prosecutor working with a grand jury. *See DiGenova*, 779 F.2d 80 n.12. If a recipient of a grand jury subpoena does not produce the evidence sought, the

11

recipient that disobeyed the subpoena (which is essentially an order of the court), is in contempt, s*ee* 28 U.S.C. § 1826; FED. R. CRIM. P. 17(g), and may be fined or imprisoned, *see* 28 U.S.C. § 1826.  Thus, unlike, for example,  a mere verbal request from a government agent, there is a legal mechanism to enforce grand jury subpoenas.  They possess the "force of law" because they are issued under the authority of a federal district court, and disobedience can lead to a legal sanction. *See generally Calandra*, 414 U.S. at 345 ("The power of a federal court to compel persons to appear and testify before a grand jury is . . . firmly established.").

But Coronado is quick to point out that the reach of grand jury subpoenas is not unlimited: a federal district court has the power to quash a grand jury subpoena requesting documents "if compliance would be unreasonable or oppressive," *see* FED. R. CRIM. P. 17(c), and a grand jury "may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law."  *Calandra*, 441 U.S. at 346.  Also, Congress has the power to limit grand jury subpoenas by enacting statutes, *see Gelbard v. United States*, 408 U.S. 41, 52 (1972) (holding that, under 18 U.S.C. § 2515, a witness called before a grand jury can refuse to answer questions based on information obtained in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968).  Coronado argues that the account records demanded in the grand jury subpoenas here were "privileged"

12

under the ECPA and therefore outside the reach of the grand jury. His argument is, essentially, that because § 2703(a) of the ECPA states that "[a] governmental entity may require the disclosure . . . of the contents of an electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant under the Federal Rules of Criminal Procedure," and because grand jury subpoenas are not warrants, the grand juries lacked the power to compel production of his account information. Therefore, BankAtlantic's disclosure pursuant to a grand jury subpoena violated this provision of the ECPA, and it cannot use the shelter of the Annunzio-Wylie Act's safe harbor, Coronado concludes.

Coronado's argument begs the question. The question here is not whether the government or the grand jury obtained evidence in violation of the ECPA, but whether BankAtlantic is liable to Coronado for its disclosure. BankAtlantic was subpoenaed merely as a witness, and long-standing grand jury policy and practice suggests that we do not want witnesses (who are not even targets of the grand jury) testing the limits of the grand jury's authority. The Supreme Court has emphasized that "a witness may not interfere with the course of the grand jury's inquiry." *Calandra*, 414 U.S. at 345. Further, as a witness, BankAtlantic was "not entitled to urge objections of incompetency or irrelevancy, such as a party might raise," *id.*,

13

nor was BankAtlantic entitled "to challenge the authority of the court or of the grand jury, provided they have a de facto existence and organization." *Blair v. United States*, 250 U.S. 273, 282 (1919) (holding that witnesses could not refuse to testify or produce documents on the ground that the relevant criminal statute was unconstitutional). *See also Calandra*, 414 U.S. at 345. "[A witness] is not entitled to set limits to the investigation that the grand jury may conduct." *Blair*, 250 U.S. at 282. Thus, even if the ECPA technically deprived the grand jury of the authority to demand the account records from BankAtlantic, BankAtlantic—as a witness—was not in a position to test the limits of the grand jury's authority. BankAtlantic was presented with facially valid subpoenas from three federal grand juries investigating money laundering. Forcing a bank to challenge a facially valid grand jury subpoena in order to avoid liability to one (or more) of its customers would fly in the face of both the Annunzio-Wylie Act's clear intent to encourage cooperation with money laundering investigations and the more general policy favoring the "effective and expeditious discharge of the grand jur[ies'] duties." *Calandra*, 414 U.S. at 349-50. We believe it proper to label grand jury subpoenas, like search warrants or court orders, "legal authority" under *Lopez*, and we find that a grand jury subpoena qualifies as "other authority" under the Annunzio-Wylie Act's third safe harbor. BankAtlantic's disclosure, therefore, is covered by the

14

third safe harbor.

Having determined that BankAtlantic is protected by § 5318(g)(3)'s third safe harbor, it remains only to determine the scope of the immunity granted by the statute. This is a straight-forward determination. Section 5318(g)(3) states that a qualified bank "shall not be liable to *any* person under *any* law or regulation of the United States or any constitution, law, or regulation of any State." 31 U.S.C. § 5318(g)(3) (emphasis added). This immunity is *very* broad.[2] As we recently reiterated in *Lopez*, "the adjective 'any' is not ambiguous; it has a well-established meaning" and, "[r]ead naturally, . . . has an expansive meaning, that is, one or some indiscriminately of whatever kind." 129 F.3d at 1192 (citations omitted). "*Any* person" certainly includes Coronado, and "*any* law or regulation" includes the ECPA, the RFPA and Florida law. (In fact, § 5318(g)(3) immunizes BankAtlantic from suit under *every* source of law except the United States Constitution.) Because BankAtlantic disclosed Coronado's account records and information pursuant to facially valid grand jury subpoenas, BankAtlantic is

---

[2] There is no official legislative history for the Annunzio-Wylie Act, but in a letter written after the passage of the Act, Chairman of the House Subcommittee on Financial Institutions, and sponsor of the Act, Congressman Frank Annunzio explained in a letter that the immunity provisions of the Act sought "to provide the broadest possible exemption from civil liability for the reporting of suspicious transactions. . . ." Cong. Rec. E57-02 (1993).

immune from any lawsuit arising from these disclosures.[3]  Therefore, the district court properly granted BankAtlantic's motion for summary judgment.

B.    Discovery

In his remaining argument, Coronado contends that the district court improperly denied his motions to compel discovery because the denials inhibited his ability to defend against BankAtlantic's motion for summary judgment. Specifically, Coronado contends that BankAtlantic should have been compelled to (1) provide him with copies of the bank's FedWire Funds Transfer System contracts, (2) provide copies of all documents describing the bank's computer accounting system, (3) provide copies of the grand jury subpoenas and documents produced to the grand juries and (4) allow Coronado to depose Frank Greico, a member of BankAtlantic's upper management, about the contents of the grand jury subpoenas and documents produced.  Coronado cites little if any legal authority for the allegedly "required" disclosure of *any* of these materials.  Despite his protestations, we find that the district court did not abuse its discretion by denying these motions.

As Coronado concedes in his brief, the FedWire contracts and information

---

[3] Our determination that BankAtlantic is immune under the Annunzio-Wylie Act eliminates any need to address Coronado's second argument on appeal (that he is entitled to summary judgment on his ECPA and RFPA claims).

on BankAtlantic's computer system were only relevant to establishing his claim under the ECPA. But, given that BankAtlantic is immune under the Annunzio-Wylie Act, Coronado's claim under the ECPA is not viable. Hence, any possible abuse of discretion in denying Coronado's motion to compel production of this information was harmless. *See Dykes v. Depuy, Inc.*, 140 F.3d 31, 42 (1st Cir. 1998).

Coronado's other two motions to compel sought production of grand jury materials. Coronado claims that he wanted access to these materials to determine whether BankAtlantic really complied with the subpoenas as it claims. BankAtlantic could not turn over the documents, nor could Mr. Greico answer deposition questions about the grand jury, because it is illegal for them to do so. *See* 18 U.S.C. § 1510(b)(2) (making it a crime for a bank to directly or indirectly notify a customer of the contents of a grand jury subpoena or information furnished to a grand jury pursuant to a subpoena). The only way Coronado could have obtained grand jury materials was through a court order pursuant to Federal Rule of Criminal Procedure 6(e)(3)(C)(i), but he never sought such an order. Even if he had, a district court has "substantial discretion" in balancing the need for disclosure with the need for grand jury secrecy. *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979).

17

Here, Coronado's need for disclosure was tied to his desire to verify BankAtlantic's strict compliance with the subpoenas. Frank Greico and a government investigator each filed an affidavit stating that the information submitted by BankAtlantic was limited to that which was responsive to the subpoenas, and the district court gave Coronado an opportunity to depose both on their affidavits before it granted summary judgment. Additionally, to verify for itself the accuracy of the affidavits, the district court reviewed the subpoenas and the documents provided to the grand juries *in camera*. We believe this procedure appropriately balanced the need for grand jury secrecy with Coronado's needs as a litigant. *See Young v. United States*, 406 F.2d 960, 961 (D.C. Cir. 1969) (noting that an *in camera* inspection is the proper way to maintain the secrecy of grand jury proceedings and meet the needs of litigation). Therefore, the district court did not abuse its discretion by denying Coronado's motion to compel production of the grand jury materials.

III.    Conclusion

For the foregoing reasons, we reject Coronado's arguments on appeal and AFFIRM the judgment of the district court.