801 F.2d 714
 Fed. Sec. L. Rep. P 92,924
CITY NATIONAL BANK, as Executor of the estate of John S.
Cansler, deceased; Nell V. Bates; Anna Pender Griffith;
Virginia T. Johnson; Lacy D. Kessler; S. Dewey Kessler;
A.H. Kimball; H. Brown Kimball; Ann Dupree King; Rose
Dupree King, deceased; John D. King; Marie Dowd Latimer;
T.F. Morgan; Grace E. Morgan; Mary Rogers Pender Murphy;
Ludie B. Parker; John Robert Pender, III; John Robert
Pender, IV; Mary D. Pender; W.L. Pender; Gaylord Myers
Pender; Deborah Grace Speece; Oliver Brown Thomas;
Charles Nixon White; Doris Haire White; Rogers Pender
Williams, Appellees,
v.
AMERICAN COMMONWEALTH FINANCIAL CORP.; Great Commonwealth
Life Insurance Co.; and Robert T. Shaw, ICH
Corporation, Appellants.
CITY NATIONAL BANK, as Executor of the estate of John S.
Cansler, deceased; Nell V. Bates; Anna Pender Griffith;
Virginia T. Johnson; Lacy D. Kessler; S. Dewey Kessler;
A.H. Kimball; H. Brown Kimball; Ann Dupree King; Rose
Dupree King, deceased; John D. King; Marie Dowd Latimer;
T.F. Morgan; Grace E. Morgan; Mary Rogers Pender Murphy;
Ludie B. Parker; John Robert Pender, III; John Robert
Pender, IV; Mary D. Pender; W.L. Pender; Gaylord Myers
Pender; Deborah Grace Speece; Oliver Brown Thomas;
Charles Nixon White; Doris Haire White; Rogers Pender
Williams, Appellants,
v.
AMERICAN COMMONWEALTH FINANCIAL CORP.; Great Commonwealth
Life Insurance Co.; and ICH Corporation, Appellees.
 Nos. 85-2000, 85-2147.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1986.
Decided Sept. 25, 1986.
 
 G. Richard Poehner, Dallas, Tex. (George R. Poehner, William F. LePage, Moore & Peterson, Dallas, Tex., Jimmy H. Barnhill, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., on brief), for appellants/cross-appellees.
 Thomas Ashe Lockhart, Charlotte, N.C. (Bruce M. Simpson, Cansler & Lockhart, P.A., on brief), for appellees/cross-appellants.
 Before HALL and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 American Commonwealth Financial Corp., Great Commonwealth Life Insurance Co., I.C.H. Corp., and Robert T. Shaw appeal a judgment entered on the verdict of a jury awarding damages to minority shareholders of All American Assurance Co. who sold their shares to Great Commonwealth Life Insurance Co. in response to a tender offer. The appellants assert that the evidence was insufficient to find a violation of Securities Exchange Commission Rule 10b-13 [17 C.F.R. Sec. 240.10b-13] or common law fraud. They also protest that the damages improperly reflected a control premium[1] for the tendered stock.
 
 
 2
 The minority shareholders assign error to the district court's ruling that they cannot recover either treble damages and attorney fees pursuant to North Carolina's Unfair Trade Practices Act, N.C.Gen.Stat. 75-1.1 (1985), or rescissionary damages based on the value of the shares at the time of judgment.
 
 
 3
 The district court, 608 F.Supp. 941, addressed all of the contentions raised on appeal and cross-appeal fully explaining its reasons for rejecting them. We affirm.
 
 
 4
 * In January 1979, American Commonwealth Financial Corp. acquired 67% of All American's stock from American Bank and Trust Company. American Commonwealth subsequently transferred this stock to its wholly owned subsidiary, Great Commonwealth Life Insurance Co. Robert T. Shaw was president of American Commonwealth and a director of Great Commonwealth. He became president of All American after its acquisition.
 
 
 5
 On December 14, 1979, Great Commonwealth made a tender offer for 175,000 shares of All American at $5 a share. Prior to the tender offer, Great Commonwealth arranged to purchase 57,782 shares of All American stock at $5 a share, including 18,500 shares from the Post family trusts. These private purchases were disclosed in the tender offer. The tender offer expired on January 4, 1980, and enabled Great Commonwealth to increase its holdings in All American to over 80% of its stock. In November 1982, All American merged with I.C.H. Corp., and the shareholders of All American exchanged their stock for shares of I.C.H.
 
 
 6
 In August 1982, several minority shareholders brought this class action on behalf of those shareholders who sold their All American stock to Great Commonwealth pursuant to the December 1979 tender offer. They claimed that the defendants made material misrepresentations and omissions in the tender offer in violation of Rule 10b-5. 17 C.F.R. Sec. 240.10b-5 (1986). They introduced evidence to show that the private purchase from the Post trusts was made after the commencement of the tender offer in violation of Rule 10b-13. 17 C.F.R. Sec. 240.10b-13 (1986). In addition, they claimed that the defendants committed fraud and breached their fiduciary duties. As a result, the minority shareholders charged that they were misled into selling their stock for $5 a share, a price far below its actual value. They sought compensatory and punitive damages, as well as treble damages and attorneys fees under North Carolina's Unfair Trade Practices Act. They also sought to recover rescissionary damages measured by the value of I.C.H. stock at the time of judgment.
 
 
 7
 In response to special interrogatories the jury found no violation of Rule 10b-5 because any omissions in the tender offer would not "have had actual significance in the deliberations of a reasonable shareholder." The jury found that the purchase of the Post stock violated Rule 10b-13. In addition, it found that this purchase was made with the "intent to deceive, manipulate or defraud" the minority shareholders. The jury also found that the defendants committed fraud in connection with the purchase of the minority shareholders' stock. The jury determined that a relationship of trust and confidence existed between the minority shareholders and defendants and that the defendants were guilty of a breach of fiduciary duties. The jury awarded $5.28 a share in damages. During the course of the proceedings the district court denied the minority shareholders recovery under the Unfair Trade Practices Act and their claim for rescissionary damages. After denying the defendants' motions for judgment notwithstanding the verdict and for a new trial, the district court entered judgment on the verdict in favor of the minority shareholders.
 
 II
 
 8
 The defendants contend that evidence is not sufficient to support the jury's finding that the purchase of the Post stock violated Rule 10b-13, which prohibits private purchases after the announcement of a tender offer.[2]
 
 
 9
 Great Commonwealth entered into a stock purchase agreement on December 11, 1979, for the Post stock. The agreement required Great Commonwealth to pay 5% of the purchase price at the closing on December 12, with the balance due on January 2, 1980. One of the defendants' witnesses testified that the stock certificates were transferred to the defendants on December 12. The defendants contend that this evidence establishes, as a matter of law, that they acquired ownership of the Post stock on December 12, two days before the public announcement of the tender offer.
 
 
 10
 The district court properly ruled that pre-tender private purchases are not covered by Rule 10b-13 although they are still subject to the general antifraud provisions of the Securities Act. See Sunshine Mining Co. v. Great Western United Corp., [1977-1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 96,049 (D.Idaho Apr. 22, 1977); Heine v. Signal Companies, Inc., [1976-1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 95,898 (S.D.N.Y. Mar. 4, 1977).
 
 
 11
 The minority shareholders presented evidence that Great Commonwealth did not pay 5% of the price of the stock on December 12 as required by the purchase agreement. Instead, payment was made after December 17. This raised the issue whether the parties intended to transfer ownership of the stock on December 12 or at the time Great Commonwealth made the initial payment. The court properly submitted this issue to the jury.
 
 
 12
 In its opinion denying the motion for judgment notwithstanding the verdict, the district court carefully reviewed the evidence pertaining to the date of the purchase of the Post stock. The district court pointed out that ample circumstantial evidence existed for discrediting the witness's testimony that the shares were delivered and the sale closed on December 12. Not until December 17 did Great Commonwealth's lawyer direct an official of the company to pay the initial 5% of the purchase price. No explanation was given for this delay, and the jury could draw the reasonable inference that a prudent lawyer would not direct his client to pay for stock until the shares were in hand. The district court noted discrepancies in the dates of pertinent documents and the lack of any valid, credible business reason for the private purchase of the Post shares. The district court also pointed to a business relationship between Shaw and Post. Post owned a substantial amount of I.C.H. stock. Through its holdings in Ozark National Life Insurance Co., I.C.H. had a substantial interest in American Commonwealth Financial Corp. which owned 100% of Great Commonwealth, the purchaser of the Post stock. As the district court observed, the jury could reasonably find that the purchase from Post of a large block of stock at $5 a share was made to influence the minority shareholders to sell to Great Commonwealth at this price.
 
 
 13
 We reject Great Commonwealth's argument that it did not violate Rule 10b-13 because it became the beneficial owner of the Post stock upon entering into the stock purchase agreement. It is the purchase of stock that Rule 10b-13 regulates, not the claim to beneficial ownership. Moreover, the stock purchase agreement did not purport to convey beneficial ownership of the stock on December 11, the date of its execution. Instead, it specifically provided that the stock would be delivered and 5% payment made at the closing. Therefore, Great Commonwealth's status as a party to an executory contract to purchase stock in the future does not immunize it from application of Rule 10b-13.
 
 
 14
 We also reject the defendants' argument that Texas law establishes that Great Commonwealth became the owner of the Post stock at the time the stock certificates were delivered. Reliance on this provision of Texas law does not resolve the question. The contract provided that delivery and 5% payment were to be made simultaneously. The date on which this took place raised a factual question that the jury resolved against the defendants.
 
 
 15
 The defendants also contend that the evidence is insufficient to sustain the jury's finding of common law fraud. They particularly challenge the jury's findings that there was a relationship of trust and confidence between the minority stockholders and the defendants and that the defendants practiced fraud and deceit, which was a proximate cause of damage to the minority shareholders. The defendants contend that a finding of common law fraud is inconsistent with the jury's answer to interrogatory 3 in which it found that the disclosure of omitted material facts in the tender offer would not have had actual significance in the deliberations of a reasonable shareholder as to whether to sell his stock.
 
 
 16
 We agree with the district court that under North Carolina law the evidence was sufficient for the jury to find a relationship of trust and confidence between the minority shareholders and the defendants. See Lazenby v. Goodwin, 40 N.C.App. 487, 253 S.E.2d 489 (1979), aff'd on retrial remanded for damages, 60 N.C.App. 504, 299 S.E.2d 288 (1983). For reasons adequately explained by the district court in its opinion denying the motion notwithstanding the verdict, we conclude that there is no inconsistency in the jury's answers to the interrogatories and that the evidence is sufficient to sustain the jury's finding of fraud and deceit. Special interrogatory 3 referred to a number of alleged omissions in the tender offer. These, however, were quite distinct from the affirmative acts pertaining to the purchase of the Post stock with the intent to create the false impression that $5 was a reasonable price.
 
 
 17
 The defendants contest the amount of damages that the jury awarded. In computing damages, the jury was required to determine the value of the plaintiffs' stock at the time of the tender offer in December 1979. The jury determined that the stock was worth $10.28 a share, which is the same price that American Commonwealth paid when it acquired a controlling block of All American stock in January 1979. The defendants contend that the jury's measure of damages must be set aside because it awarded the minority shareholders a control premium for their minority interest in All American.
 
 
 18
 Shaw stated in his deposition that $10.28 a share was a bargain price to pay for a controlling block of All American stock. He testified that he would have paid more. The jury could interpret his testimony to mean that a controlling interest was worth more than $10.28 a share in January 1979. In addition, the minority shareholders' expert testified that the minority interest was worth $14.63 a share in December 1979. Therefore, the jury could reasonably find that the value of the stock in December 1979 was $10.28 a share, even though the shareholders had a minority interest. Accordingly, the jury's award of damages is supported by the evidence.
 
 
 19
 Both a trial court and an appellate court are subject to stringent limitations when they consider a motion for judgment notwithstanding the verdict. See 9 Wright & Miller, Federal Practice and Procedure Sec. 2524 (1971). Measured by these familiar restrictions, the evidence was sufficient to sustain the verdict, and the district court did not err by denying the defendants' motion.
 
 III
 
 20
 In their cross-appeal, the minority shareholders assign error to the district court's ruling that because the North Carolina Unfair Trade Practices Act, N.C.Gen.Stat. 75-1.1, does not apply to securities transactions, they cannot recover treble damages and attorney fees. They contend that the Act applies because the jury found common law fraud and breach of fiduciary duty in addition to a violation of Rule 10b-13.
 
 
 21
 The district court correctly anticipated the North Carolina Supreme Court's construction of the Act. In a case decided after the district court's ruling, the Supreme Court held that the Act did not apply to securities transactions. Significantly the plaintiffs in that case alleged fraud, constructive fraud, and misrepresentation. See Skinner v. E.F. Hutton & Co., 314 N.C. 267, 269, 274-75, 333 S.E.2d 236, 238, 241 (1985).
 
 
 22
 We also agree with the district court that the minority shareholders' undue delay in making a demand and their failure to mitigate their damages forecloses their claim for the rescissionary damages that they sought to compute as of the date of the judgment. See S.E.C. v. McDonald, 699 F.2d 47, 53 (1st Cir.1983); Baumel v. Rosen, 412 F.2d 571, 574-76 (4th Cir.1969); Miller v. Miller, 273 N.C. 228, 239, 160 S.E.2d 65, 73-74 (1968); Bruton v. Bland, 260 N.C. 429, 430, 132 S.E.2d 910, 911 (1963).
 
 
 23
 The judgment of the district court is affirmed.
 
 
 
 [1]
 "[T]he value of a controlling position in a corporation is worth more on a per share basis than a non-controlling interest." Alna Capital Associates v. Wagner, 758 F.2d 562, 566 (11th Cir.1985). This enhanced value is termed a control premium
 
 
 [2]
 Rule 10b-13, 17 C.F.R. Sec. 240.10b-13 (1986), provides:
 No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected.