**Ian ROGERS, Colleen Rogers, and the Ian Rogers, M.D. Defined Contribution Plan, Plaintiffs,**

v.

**CISCO SYSTEMS, INC., Defendants.**

**No. 3:03 CV 32/LAC/MCR.**

United States District Court, N.D. Florida, Pensacola Division.

May 14, 2003.

**1306**

James Nixon Daniel, Esq, Beggs & Lane—Pensacola FL, Pensacola, FL, for plaintiffs.

Barry Richard, Esq, Glenn T. Burhans, Jr, Esq, Greenberg, Traurig PA, Tallahassee, FL, for defendants.

## ORDER

COLLIER, District Judge.

THIS CAUSE comes before the Court on Defendant Cisco Systems, Inc.'s Motion

to Dismiss Plaintiffs' Complaint (Doc. 6). Plaintiffs Ian Rogers, Colleen Rogers, and the Ian Rogers, M.D. Defined Contribution Plan have responded in opposition to Defendant's motion (Doc. 19). For the reasons stated below, Defendant Cisco Systems, Inc.'s motion is **GRANTED IN PART**.

## I. BACKGROUND

### A. Procedural History

On November 21, 2002, Plaintiffs filed a complaint in the Circuit Court for Escambia County, Florida (Doc. 1, Attach.B). The Plaintiffs alleged that Defendant Cisco Systems, Inc. ("Cisco") and its officers and directors fraudulently misrepresented Cisco's earnings during the years 1999, 2000, and 2001 in such a manner that caused the Plaintiffs to retain their Cisco stock after the value of the stock suddenly collapsed upon disclosure of the allegedly fraudulent practices.[1] On January 23, 2003, Cisco filed a notice of removal in this Court that based jurisdiction on diversity of citizenship (Doc. 1). Shortly thereafter, on February 21, 2003, Cisco filed a motion to dismiss the Plaintiffs' complaint for failure to state a claim for which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 6). On March 28, 2003, Plaintiffs filed a memorandum in opposition to Cisco's motion (Doc. 19). Shortly after filing its motion to dismiss, Cisco filed, pursuant to Title 28,

United States Code, Section 1407, a motion with the Judicial Panel on Multidistrict Litigation (the "MDL Panel") to transfer this case to the United States District Court for the Northern District of California for consolidation with several other securities class actions currently pending in that court against Cisco. Cisco's petition is currently pending before the MDL Panel, and the parties have agreed to stay discovery in this case pending the resolution of the petition.[2]

### B. Relevant Facts

For purposes of ruling on this motion, the following facts are assumed true and viewed in the light most favorable to the Plaintiffs. Cisco is a publicly held corporation that is in the business of developing and marketing computer networking products that form the technological backbone of the Internet. According to the complaint, Cisco, through its officers, directors, and representatives, made false and misleading statements regarding Cisco's financial status and earnings in a calculated effort to encourage its stockholders, including the Plaintiffs, to retain their stock, thereby artificially inflating Cisco's stock value. Cisco's primary corporate strategy was to achieve rapid growth through the acquisition of other companies who possessed technologies Cisco wished to acquire and incorporate into its product mix. These acquisitions were largely financed through the exchange of Cisco stock, rather than through cash purchase.[3] Beginning in 1999, Cisco began experienc-

---

1. The complaint alleges the following counts: Count I—Fraud, Count II—Breach of Fiduciary Duty, Count III—Negligent Misrepresentation, and Count IV—Violation of the Florida Deceptive and Unfair Trade Practices Act.

2. However, the "pendency of a motion...before the Panel concerning transfer...does not affect or suspend orders and pretrial proceedings in the district court in which the action is

pending and does not in any way limit the pretrial jurisdiction of that court." Rule 1.5 of the Judicial Panel on Multidistrict Litigation, *available at* 199 F.R.D. 425, 427 (J.P.M.L. Apr. 2, 2001).

3. According to the complaint, any reduction in the value of Cisco's stock would hinder the company's ability to carry out this strategy by limiting the capital with which Cisco could acquire new companies.

ing a reduced demand for its products and a slow-down in the development and testing of new products. The complaint alleges that Cisco's senior management, including president and chief executive officer John T. Chambers, senior vice president for finance and chief financial officer Larry R. Carter, and senior vice president and chief strategy officer Michaelangelo Volpi, were "almost immediately" aware of the problems related to the slow-down due to the company's sophisticated system of inventory controls and daily financial reports.

According to the complaint, beginning in 1999 and continuing through early 2001, Cisco used several tactics to "create sales" in order to indicate that Cisco appeared to be profitable on its books, though these sales were not really profitable. For instance, Cisco provided financing for the sale of its products, through its subsidiary Cisco Systems Capital, in amounts equal to or in excess of the purchase price and on extremely liberal terms to undercapitalized companies [4] who were, in reality, unlikely to fully repay the loans, but Cisco did not retain adequate reserves to account for the likelihood of future bad debt. The complaint states that "much of the growth Cisco reported between late 1999 and mid–2001 was the result of sales made to uncreditworthy customers funded by Cisco Systems Capital." (Doc. 1 Attach. B at ¶ 11.) This was done, according to the Plaintiffs, to inflate sales revenues by recognizing the full value of sales but not properly accounting for the very real risk of non-payment.

The slow-down in sales at Cisco, of which Cisco's senior executives were aware, resulted in the accumulation of ex-cess inventories which, by mid–2000, had created a financial crisis at Cisco. The failure of many of the technology companies that had formerly purchased Cisco's products resulted in a large amount of used Cisco products being dumped on the market, thereby decreasing the demand for Cisco's new products. According to the complaint, this situation was exacerbated by the long term contracts Cisco had negotiated with suppliers that required Cisco to pay substantial penalties if orders for component parts were canceled. Instead of canceling the orders, Cisco opted to receive unneeded component parts, further increasing inventory levels.

The complaint alleges that Cisco executives, who also held large amounts of Cisco stock, were aware that if the sales slow-down and increased inventory levels were made known to investors, many shareholders would sell their stock and Cisco's stock value would plummet. Because maintenance of the stock value was critical to Cisco's corporate strategy, several Cisco senior executives named in the complaint:

began in late 1999 an attempt to manipulate Cisco's stock value by fraudulently and deceptively recording and reporting Cisco's financial data to its shareholders. Cisco, through its senior management, accomplished this in two ways. It supplied false and misleading financial data on the various financial reports made available to the public including those reports filed with the Securities and Exchange Commission. It also gave false and misleading public announcements regarding its financial status. Cisco's intention was to convince its shareholders to hold their stock by providing them with false and misleading informa-

---

4. The complaint alleges that these companies included American Metricomm, Digital Broadband, HarvardNet, PSI Net, and Vectris. (Doc. 1 Attach. B at ¶ 21.) In December of 2000, Cisco filed forms with the SEC which revealed the creation of a $275 million reserve for uncollectible accounts receivable and overvalued inventory, a substantial increase in the prior reserve account.

tion. Thus beginning in late 1999 and continuing through early 2001 Cisco through various financial manipulations disguised its true financial status from its shareholders.

(*Id.* at ¶ 17.)

The complaint alleges that Cisco filed false financial results for the fourth quarter of 1999, and every quarter thereafter through the second quarter of 2001, which included false statements of revenue, net income, and earnings per share. The complaint alleges these financial statements were false when made, that Cisco executives knew they were false, and that the false statements were made with the intention that Cisco's shareholders believe them and rely upon them. The Plaintiffs allege Cisco's financial statements were false because Cisco did not account for the likelihood of bad debt on the uncreditworthy loans described above, and that such a failure was a violation of Generally Accepted Accounting Principles ("GAAP"), which were required to be complied with in any filing with the Securities and Exchange Commission ("SEC").[5] The complaint also alleges that Cisco's statements of revenue, net income, and earnings per share in its

1999–2001 financial statements were false because Cisco frequently shipped non-functioning units, in some cases only product shells with no internal working parts, in an effort to record a "sale" on its books in a particular quarter.[6]

■ The complaint contains quotations from Cisco's quarterly financial reports dated August 10, 1999, November 9, 1999, February 8, 2000, May 9, 2000, August 8, 2000, and November 6, 2000, each of which contain statements of net sales, net income, and earnings per share. The complaint also sets forth the text of numerous news articles published in the years 1999–2001, each identified by date and source, which contain quotations from Cisco executives regarding Cisco's rate of revenue growth, most of which forecasted revenue growth of 30–50%.[7] The complaint alleges that each of theses statements were false when made and were made with the intention that shareholders, such as Plaintiffs, retain their stock, and that when the truth about Cisco's misrepresentations came to light in early 2001, Cisco altered its financial reports to reflect its true financial condition and Cisco's stock value plummeted from a high of $82 to as low as $13.50.[8]

5. Specifically, the Plaintiffs allege that Cisco's accounting practices violated GAAP, as described in Statement of Concepts No. 5 by the Financial Accounting Standards Board ("FASB") which requires that revenue be recognized when it is earned and is collectible. The complaint also alleges Cisco's accounting practices violated GAAP by improperly valuing its inventory, resulting in an overstatement of revenues, net income, and earnings per share. The complaint further alleges eight other FASB standards Cisco violated.

6. The complaint identifies one particular shipment in the summer of 1999 to Worldwide Web in Miami which recognized sales of $400,000 in relation to fourteen switches, which were in actuality, only shells with no working parts. The complaint alleges that this was a common practice by Cisco when products were in short supply at the end of a

quarter in an effort to get the sale recognized on the current quarter. In the next quarter, Cisco would later replace the defective product with a working one.

7. In a Wall Street Journal article quoted in the complaint and published on November 3, 2000, Cisco's chief strategy officer Michaelangelo Volpi stated, "We haven't seen any sign of a slowdown." According to the article, Volpi further stated that Cisco had made no changes to its internal plans since August of 2000.

8. However, The Court takes judicial notice that Cisco's stock was valued at $29 per share in August of 1999, rose to a peak of $80.06 per share on March 27, 2000, was valued at $31.06 on February 7, 2001, and at $15.81 on March 30, 2001. Cisco's stock eventually

The Plaintiffs, who purchased the majority of their Cisco shares in 1991, state that, between late 1999 and early 2001, they relied on Cisco's false and misleading statements in determining to retain their stock by reviewing: Cisco's quarterly and annual reports filed with the SEC, Cisco's statements and press releases which accompanied those reports, the financial press, and the comments of financial analysts regarding Cisco's financial status. The Plaintiffs allege that, "Had Cisco informed [Plaintiffs] of the whole truth as it was required to do, plaintiffs would have sold their stock shortly after learning the truth and at a much higher price than its subsequent value." Cisco now moves to dismiss the complaint for failure to state a claim.

## II. MOTION TO DISMISS

### A. Standard

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is designed to eliminate counts or complaints that fail to state a claim upon which relief can be granted. As such, this Court must accept all allegations of the complaint as true and construe those allegations in the light most favorable to Plaintiffs. *See Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1189 (11th Cir.1997); *Webb v. Town Council of Town of Hilliard*, 766 So.2d 1241, 1243 (Fla. 1st DCA 2000); *Rohatynsky v. Kalogiannis*, 763 So.2d 1270, 1272 (Fla. 4th DCA 2000). A count may not be dismissed for failure to state a claim unless it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *See Lopez v. First Union Nat'l Bank*

*of Fla.*, 129 F.3d 1186, 1189 (11th Cir. 1997). "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low." *Quality Foods de Centro Am. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir.1983).

### B. Discussion

#### 1. Pleading with Particularity under Rule 9(b)

Cisco contends that the Plaintiffs have failed to sufficiently plead their claims of fraud, negligent misrepresentation, and breach of fiduciary duty as required by Rule 9(b) of the Federal Rules of Civil Procedure.[9] Rule 9(b) states that, "In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir.1988)(quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984)). "The application of Rule 9(b), however, 'must not abrogate the concept of notice pleading.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001)(quoting *Durham*, 847 F.2d at 1511).

Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made and (2) the time and place of each such statement and the person responsi-

---

reached $11.24 on September 27, 2001, and is currently trading at around $15 per share.

**9.** The Private Securities Litigation Reform Act of 1995, ("PSLRA"), 15 U.S.C. § 78u–4(b), imposes heightened pleading standards, even

more stringent than Rule 9(b), upon certain plaintiffs seeking to recover for violations of Section 10(b) of the Securities Exchange Act of 1934 or Rule 10b–5 of the SEC. However, the Plaintiffs' state common law claims are not subject to the PSLRA.

ble for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

*Id.* (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997)).

 The Plaintiffs' complaint satisfies this standard.[10] The complaint identifies what statements were made: Cisco's reports of net sales, net income, and earnings per share, and the statements by Cisco's executives of, among other things, expectations of continued annual revenue growth between 30–50% per year.[11] The complaint identifies the documents in which these statements were made (Cisco's quarterly financial reports and press releases) or to whom the oral statements were made (various news agencies which later appeared as quotations in articles). The complaint identifies the time each statement was made, identifying in most instances the specific dates reports were filed or statements were made. The complaint identifies the persons who made the

statements, identifying most of them by name, and regarding the financial reports, indicating which officers signed the reports and SEC filings. The complaint identifies the content of each statement, most often quoting the statements verbatim. The complaint identifies the manner in which the statements misled the Plaintiffs: convincing them to retain their Cisco shares despite the fact that Cisco's financial status was significantly worse than the representations would indicate.[12] Finally, the complaint identifies the benefit Cisco obtained as a consequence of the fraud: by being able to continue to implement its corporate strategy of growth through acquisition even after its financial condition soured to an extent that such a strategy would have been hindered had Cisco's true financial status been known.

### 2. Pleading Reliance

 While, as a general matter, Plaintiffs have sufficiently pled fraud to satisfy Rule 9(b), The Court concludes that Plaintiffs have insufficiently pled reliance to state a "holding claim" for fraud or negligent misrepresentation.[13] Cisco as-

10. The level of specificity with which Cisco has responded, in its motion to dismiss, to the complaint's numerous factual allegations, (*See* Def. Mot. to Dismiss, Doc. 6, at 12–16.), should be indication enough that the Cisco has been alerted to the "precise misconduct with which [it is] charged." *Durham,* 847 F.2d at 1511.

11. The statements of Cisco executives are quoted in the complaint. The complaint goes even further by explaining *why* Cisco's representations were fraudulent by identifying specific practices, including in some instances naming particular customers and in one instance a specific shipment of goods, utilized by Cisco to allegedly inflate its revenues.

12. Defendant's contention that the Plaintiffs must allege the *amount* by which Cisco overstated its revenues as a result of the accounting practices alleged in the complaint, though

recognized by other Circuits, seems to place an unnecessarily exacting burden on the Plaintiffs in light of the Rule 9(b) standard identified by the Eleventh Circuit in *Ziemba.* Compare *Gross v. Summa Four, Inc.,* 93 F.3d 987, 996 (1st Cir.1996)(requiring plaintiff to allege the putative amount of earnings overstatement or the net effect alleged revenue recognition impropriety had on company's earnings in order to satisfy Rule 9(b)). Rule 9(b) does not require a plaintiff to possess the expertise of a forensic accountant in order to state claim for common law fraud.

13. The federal and Florida securities laws only apply to the purchase or sale of securities and not to representations intended to induce a stockholder to retain their securities. *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1343 (11th Cir. 2002)("[W]hile 'holding' claims are not actionable under federal securities laws, they may well be actionable under state laws.");

serts that the plaintiffs fail to allege that they actually read the various statements identified during the 1999–2001 period identified in the complaint and relied upon them in deciding not to sell their Cisco shares.

> In order to state a claim for fraudulent misrepresentation the plaintiffs must allege "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation."

*Elders v. United Methodist Church*, 793 So.2d 1038, 1042 (Fla. 3d DCA 2001)(quoting *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985)); *see also Lance v. Wade*, 457 So.2d 1008, 1011 (Fla.1984). The elements of a negligent misrepresentation claim are essentially the same as those for fraudulent misrepresentation, except that, instead of knowledge of the falsity of the representation, the plaintiff need only prove that the representor *reasonably should have known* of the statement's falsity. *C & J Sapp Publ'g Co. v. Tandy Corp.*, 585 So.2d 290, 292 (Fla. 2d DCA 1991); *Atlantic Nat'l Bank of Fla. v. Vest*, 480 So.2d 1328, 1332 (Fla. 2d DCA 1985). Under either theory, the Plaintiffs must plead and prove justifiable and detrimental

reliance. There is some question whether a fraud-on-the-market theory, which would establish a presumption of reliance, exists under Florida law.[14] *See Kahler v. E.F. Hutton Co., Inc.*, 558 So.2d 144, 145 (Fla. 3d DCA 1990)(fraud-on-the-market claims lie exclusively within the province of federal courts under federal securities laws); *see also Tapken v. Brown*, 1992 WL 178984 at *24 n. 18 (S.D.Fla. Mar.13, 1992)(unpublished)(noting uncertainty among federal district courts in Florida about the existence of fraud-on-the-market theory). Assuming that no presumption of reliance is available under such a theory in Florida, the Plaintiffs must allege and prove that they actually and justifiably relied upon Cisco's representations. The complaint alleges that the Plaintiffs relied upon Cisco's quarterly and annual financial statements, statements by Cisco executives, and financial news reports identified in the complaint and, in so doing, were induced, as Cisco intended, to retain their shares. (Doc. 1, Attach. B at ¶ 35.)

██ While Florida law requires a showing of detrimental reliance by the plaintiff due to the defendant's material misrepresentations,[15] no Florida court appears to have squarely addressed whether a representee who actually and justifiably *refrains from acting* due to a fraudulent misrepresentation which was made with

*Ward v. Atlantic Sec. Bank*, 777 So.2d 1144, 1147 (Fla. 3d DCA 2001)(assuming that Florida Securities Investors Protection Act, § 517.011, *et. seq., Florida Statutes*, like analogous federal securities laws, would not cover holding claims because they are not "in connection with the offer, sale, or purchase of any investment or security."). State common law recognizes such a claim, in fraud and negligent misrepresentation, called a "holding claim."

14. Several other states have rejected such a theory as a basis for proving reliance under state common law. *White v. BDO Seidman, LLP*, 249 Ga.App. 668, 549 S.E.2d 490, 493–

94 (2001)(requiring proof of actual reliance); *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 754 A.2d 1188, 1195–96 (2000); *Ex parte Household Retail Services Inc.*, 744 So.2d 871, 879 n. 2 (Ala.1999); *Malone v. Brincat*, 722 A.2d 5, 12–13 (Del.1998); *Mirkin v. Wasserman*, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568, 572–73 (1993).

15. *Soler v. Secondary Holdings, Inc.*, 771 So.2d 62, 69 (Fla. 3d DCA 2000); *Hillcrest Pacific Corp. v. Yamamura*, 727 So.2d 1053, 1057 (Fla. 4th DCA 1999); *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So.2d 1210, 1214 (Fla. 5th DCA 1995); *Bibb v. Bickford*, 149 So.2d 592, 594 (Fla. 1st DCA 1963).

the intention to induce the representee to *refrain from acting* satisfies the detrimental reliance requirement. One recent Florida court decision indicates that a fraudulent misrepresentation that induces another to refrain from acting may state a viable cause of action for fraud. *Hollywood Lakes Country Club, Inc. v. Community Ass'n Services, Inc.*, 770 So.2d 716, 718 (Fla. 4th DCA 2000)(developer who sued residential services company that contracted with developer to carry out all developer's responsibilities of homeowner's association and that misrepresented it was properly collecting assessed fees causing developer to refrain from independently collecting fees for which developer was liable and resulting in developer being liable for shortfall stated a cause of action for fraud). Regardless, such a theory of relief has been recognized by Section 525 of the Restatement (Second) of Torts, which states that:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act *or to refrain from action* in reliance upon it, is subject to liability to the other in deceit for the pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) Torts § 525 (1977); *see also* Restatement (Second) Torts § 531; 37 Am.Jur.2d *Fraud and Deceit* § 243 ("A person is entitled to damages resulting from inaction where an untrue statement is made with the intent to induce that person to refrain from acting, so long as it can be demonstrated that the false statement produced the inaction.") (citation omitted). Florida courts have frequently relied upon the provisions of the Restatement (Second) of Torts relating to fraudulent misrepresentation, and the Supreme Court of Florida has adopted Section 552 of the Restatement as the test for negligent misrepresentation in cases such as this case. *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So.2d 334, 339 (Fla.1997)(adopting § 552 of Restatement as to claims for information negligently supplied to others in the course of a business, profession, or employment); *Besett v. Basnett*, 389 So.2d 995, 997 (Fla.1980)(adopting the view of §§ 540–41 of the Restatement as to the duty to investigate falsity of fraudulent representation); *Stev–Mar, Inc. v. Matvejs*, 678 So.2d 834, 837–39 (Fla. 3d DCA 1996)(quoting Restatement §§ 546–47 as to causal link between justifiable reliance and loss); *Steinbauer Assocs., Inc. v. Smith*, 599 So.2d 746, 748 (Fla. 3d DCA 1992)(citing § 549 as to measure of damages for fraudulent misrepresentation). Further, numerous other state courts have recognized that inducing another to refrain from action is sufficient to state a cause of action in fraud.[16] While the Plaintiffs' general theory of reliance by forbearance is sound, The Court concludes the Plaintiffs have not sufficiently pled their reliance in order to state a holding claim for fraud and negligent misrepresentation. The Plaintiffs have pled that they reviewed the various financial reports filed with the SEC[17] and

---

**16.** *Small v. Fritz Cos., Inc.*, 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (2003)(shareholders stated fraud claim against corporation for producing allegedly fraudulent quarterly financial reports that grossly overreported earnings causing shareholders to refrain from selling stock); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo.2003); *Reisman v. KPMG Peat Marwick, LLP*, 57 Mass. App.Ct. 100, 787 N.E.2d 1060 (2003); *United*

*Parcel Serv. v. Rickert*, 996 S.W.2d 464, 469 (Ky.1999); *Havens v. C & D Plastics, Inc.*, 124 Wash.2d 158, 876 P.2d 435 (1994); *Janssen v. McKimmey*, 305 Ark. 360, 807 S.W.2d 920, 922 (1991); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983).

**17.** Restatement (Second) Torts §§ 536, 552(3) further provide that if a statute requires information to be filed for the protection of a particular class of persons, a person who fraudulently or negligently supplies that infor-

statements made by Cisco in 1999–2001, and that in reliance upon those reports and statements, they refrained from selling their stock. However, they merely allege that, "Had the plaintiffs known the true and accurate state of Cisco's financial condition, they would have sold their shares before the collapse in prices." This allegation is slightly too vague to satisfy reliance requirement for a holding claim. Assuming that Florida courts would recognize a cause of action in fraud or negligent misrepresentation for holding claims (and The Court believes they would), The Court also concludes that Florida courts would require the specificity in allegations of reliance recently recognized by the Supreme Court of California's decision regarding holding claims:

> In a holder's action a plaintiff must allege specific reliance on the defendants' representations: for example, that if the plaintiff had read a truthful account of the corporation's financial status, the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place. The plaintiff must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually relied upon the misrepresentations.

mation is subject to liability for losses suffered by justifiable reliance upon that information. The filing requirements in the federal securities laws, which required Cisco to file its quarterly and annual financial reports, exist to protect *all* investors, including those who decide to hold their stock based on such information.

**18.** As the Supreme Court of California explained in *Small,* the heightened burden of pleading reliance to state a holding claim reinforces the reliance requirement by separating plaintiffs who actually and justifiably relied upon the misrepresentations from the

*Small v. Fritz Cos., Inc.,* 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (Cal. 2003).[18]

The Plaintiffs allege that they would have sold their stock had they known the truth about Cisco's financial status. However, they do not allege specifically, *how many shares* they would have sold and *when* they would have sold them. As a result, Defendant's motion to dismiss Counts I (fraud) and III (negligent misrepresentation) is **GRANTED**, with leave for the Plaintiffs to amend their complaint to plead reliance with more specificity.

### 3. Breach of Fiduciary Duty

Cisco also maintains that Count II, which alleges that Cisco breached its fiduciary duty owed to the Plaintiffs, fails as a matter of law because no fiduciary relationship exists between Cisco and its shareholders, including Plaintiffs. Because Cisco is a California corporation, California law governs the fiduciary relationship between Cisco and its shareholders. The complaint alleges that Cisco's officers engaged in various conduct in an effort to disguise or misrepresent Cisco's earnings to induce its shareholders to retain their stock. "Corporate officers stand in a fiduciary relationship both to the corporation and its shareholders." *Lewis v. LeBaron,* 254 Cal.App.2d 270, 61 Cal.Rptr. 903, 911 (1967); *see also Bancroft–Whit-*

general investing public, who, though they did not so rely, suffered the loss due to the decline in share value. This distinction also separates common law fraud claims, which must prove actual reliance, from federal securities fraud claims, which may rely upon the fraud-on-the-market theory. Requiring plaintiffs to allege *when* they would have sold their shares helps focus the litigation by allowing the defendant to assess the representations it made prior to the alleged date. In this case, requiring Plaintiffs to plead when they would have sold their Cisco stock will appropriately explain exactly *when* the Plaintiffs contend Cisco's share value "collapsed."

*ney Co. v. Glen,* 64 Cal.2d 327, 49 Cal.Rptr. 825, 839, 411 P.2d 921 (1966). "A corporation has a statutory duty [under Cal. Corp. Code § 1501(a)] to furnish stockholders with an annual report; furnishing a report that is false, misleading, or improperly prepared is a breach of duty. Officers and directors owe a fiduciary duty to stockholders." *Small v. Fritz Co., Inc.,* 30 Cal.4th 167, 179, 132 Cal.Rptr.2d 490, 499, 65 P.3d 1255, —— (2003) (citations omitted). Further, Cisco may be held liable for the tortious conduct of its officers. *Frances T. v. Village Green Owners Ass'n,* 42 Cal.3d 490, 229 Cal.Rptr. 456, 723 P.2d 573, 580 (1986)(quoting *Teledyne Industries, Inc. v. Eon Corporation* 401 F.Supp. 729, 736–737 (S.D.N.Y.1975)). Thus, the Plaintiffs state a claim for breach of fiduciary duty against Cisco, and Cisco's motion to dismiss Count II is DENIED.

### 4. Application of the Florida Deceptive and Unfair Trade Practices Act to Securities Claims

Plaintiffs contend that the various earnings representations made by Cisco's officers and directors, which induced Plaintiffs to retain their Cisco stock, constituted an unconscionable, unfair, or deceptive act or practice within the terms of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See* § 501.204, *Fla. Stat.* (2002). The FDUTPA, also called Florida's "little FTC Act", proscribes "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." [19] *Id.* The FDUTPA provides that a person who suffers a loss "as a result of a violation of this part" may bring a civil action and recover actual damages, costs and attorneys' fees. § 501.211, *Fla. Stat.* The FDUTPA defines the term "violation of this part" to include (1) violation of the FDUTPA itself, (2) violation of the rules adopted under FDUTPA, (3) violation of the rules promulgated pursuant to the FTC Act, (4) violation of the standards of unfairness and deception set forth by the FTC and federal courts construing the FTC Act, or (5) violation of "any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." § 501.203(3), *Fla. Stat.* In construing the FDUTPA, courts should give "due consideration and great weight" to the "interpretations of the Federal Trade Commission and the federal courts relating to" Section 5 of the FTC Act, *codified at* 15 U.S.C. § 45(a)(1), as of July 1, 2001. *Fla. Stat.* § 501.204(2). The Plaintiffs' complaint merely alleges generally that Cisco's conduct constituted an unconscionable, unfair, or deceptive practice and does not allege that Cisco violated any specific rule or standard promulgated by either a Florida administrative agency or by the FTC.

Cisco contends that the Plaintiffs fail to state an FDUTPA claim because the FDUTPA does not apply to securities claims. Whether FDUTPA applies to claims related to securities transactions has not been addressed by any Florida court. One federal district court in Florida has held that FDUTPA does not apply to claims "arising from securities transactions." *Crowell v. Morgan Stanley Dean Witter Servs., Co., Inc.,* 87 F.Supp.2d 1287, 1295 (S.D.Fla.2000). Numerous other courts have held that various state unfair trade practices acts do not apply to securities transactions.[20] Those cases have pro-

---

19. The Court notes that by also declaring *"unconscionable* acts or practices" to be unlawful, the FDUTPA may go beyond the FTC Act, which only proscribes "unfair methods of competition" and "unfair or deceptive acts or practices." *Compare* § 501.204(1), *Fla. Stat.* (2002), *with* 15 U.S.C. § 45(a)(1). However, it is difficult to conceive of an "unconscionable" act or practice that would not also be "unfair."

20. *See Bulgo v. Munoz,* 853 F.2d 710 (9th Cir.1988)(Hawaii's "baby" FTC Act did not

vided two primary justifications for the exclusion of coverage of securities transactions. First, those courts have recognized that transactions involving the purchase and sale of securities are already heavily regulated by state and federal laws and administrative agencies which enforce those laws through complex regulatory schemes and that those laws provide plaintiffs with an appropriate civil remedy. However, such a justification is not applicable in this case because the Plaintiffs seek recovery for alleged fraudulent misrepresentations by Cisco which encouraged them to *retain* their securities, as opposed to either purchasing or selling securities. Such "holding claims" may not be asserted under *either* the federal or Florida securities laws. *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1343 (11th Cir.2002)("[W]hile 'holding' claims are not actionable under federal securities laws, they may well be actionable under state laws."); *Ward v. Atlantic Sec. Bank*, 777 So.2d 1144, 1147 (Fla. 3d DCA 2001)(assuming that Florida Securities Investors Protection Act, § 517.011, *et. seq., Florida Statutes*, like analogous federal securities laws, would

not cover holding claims because they are not "in connection with the offer, sale, or purchase of any investment or security.").

■ The other, and in light of the provisions of the FDUTPA, more compelling, justification for declining to apply the FDUTPA to securities transactions is that the FDUTPA, like most state unfair trade practices acts, is largely modeled after Section 5 of the Federal Trade Commission Act, and "the FTC Act has been consistently 'interpreted to preclude coverage of securities claims' in the overwhelming majority of state and federal courts addressing this issue." *Crowell*, 87 F.Supp.2d at 1294 (quoting *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1101 (5th Cir.1988)). The FDUTPA specifically instructs that "due consideration and great weight shall be given to the interpretations of the" FTC Act. § 501.204(2), *Fla. Stat.* (2002). This provision indicates that the FDUTPA should be interpreted consistently with the FTC Act,[21] which has been held inapplicable to securities claims. Accordingly, The Court concludes that the Supreme Court of Florida would hold that the FDUTPA

apply to securities transactions); *Spinner v. Corp. Princeville Dev. Corp.*, 849 F.2d 388 (9th Cir.1988)(same); *Smith v. Cooper/T. Smith Corp.*, 846 F.2d 325 (5th Cir.1988)(Louisiana UTPA inapplicable to securities transactions); *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095 (5th Cir.1988)(same); *City Nat'l Bank v. Amer. Commonwealth Fin. Corp.*, 801 F.2d 714 (4th Cir.1986)(North Carolina UTPA); *Couldock & Bohan, Inc. v. Societe Generale Securities Corp.*, 93 F.Supp.2d 220 (D.Conn.2000); *Dietrich v. Bauer*, 76 F.Supp.2d 312, 351 (S.D.N.Y.1999)(Calif. unfair business practices act); *Algrant v. Evergreen Valley Nurseries Ltd. Partnership*, 941 F.Supp. 495, 496–500 (E.D.Pa.1996); *Andrews v. Fitzgerald*, 823 F.Supp. 356 (M.D.N.C.1993); *Caraluzzi v. Prudential Sec., Inc.*, 824 F.Supp. 1206, 1215 (N.D.Ill.1993)(Connecticut UTPA); *Wyman v. Prime Discount Sec.*, 819 F.Supp. 79, 82, 85–

86 (D.Me.1993)(Maine); *McPhail v. Wilson*, 733 F.Supp. 1011 (W.D.N.C.1990)(North Carolina); *Weft, Inc. v. G.C. Inv. Assoc.*, 630 F.Supp. 1138 (E.D.N.C.1986)(same); *Hickey v. Howard*, 598 F.Supp. 1105 (D.Mass.1984)(Massachusetts); *but see Conkling v. Moseley, Hallgarten, Estabrook, & Weeden, Inc.*, 575 F.Supp. 760 (D.Mass.1983).

**21.** In a very recent Florida case, the Supreme Court of Florida cited to two federal court decisions interpreting the FTC Act as establishing the definitions of "unfair" and "deceptive" under the FDUTPA. *See PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So.2d 773, 777–78 (Fla.2003)(citing *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976), and *Southwest Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)).

does not apply to "holding claims" arising from the retention of securities.[22] As a result, Plaintiffs cannot state a claim under the FDUTPA, and Defendant's motion to dismiss is hereby **GRANTED** as to that claim.

## III. SUMMARY

The Court's ruling in this matter may be summarized as follows, and it is hereby **ORDERED**:

1. Defendant CISCO SYSTEMS' motion to dismiss (Doc. 6) is **GRANTED** as to Counts I, III, and IV.

2. Defendant's motion to dismiss is **DENIED** as to Count II.

3. Counts I and III are **DISMISSED**, without prejudice. The Plaintiffs are granted leave to file an amended complaint, within fourteen days, to address the deficiencies identified in this order, in lieu of which the dismissal shall be with prejudice.

4. Count IV is **DISMISSED**, with prejudice.

---

22. Recognizing the applicability of the FDUTPA to securities "holding claims" would, in addition to providing a civil remedy to plaintiffs, open the door for regulation by FDUTPA's "enforcing authority," the Florida Department of Legal Affairs. *See* § 501.203(2), (4), *Florida Statutes* (2002). Such a result would overlap with the plenary authority to regulate securities transactions Florida law already gives to the Florida Department of Banking and Finance. *See* § 517.211–.311, *Fla. Stat.*